This case for today is 4-17-0-8-1-5. People v. Turman. For the appellant is Joshua Scanlon. Is that pronounced correctly, sir? Yes, sir. And for the appellee, James Majors. Mr. Scanlon, you may proceed. May it please the Court. Counsel? Counsel. My name is Joshua Scanlon. I'm with the Office of the State Appellate Defender, and I'm here representing my client, Marcus Turman. Marcus is appealing his conviction for failure to register based on the trial court's failure to suppress evidence that was gleaned by police when they chose to stop him while he was out riding his bike. Unfortunately for Marcus, a young black man with an intellectual disability, he chose to go for a bike ride while police were on the hunt for an armed robbery suspect. Marcus was not the robber in this case, as will later show up with the victim group. However, Deputy Nicky Bolt of the Champaign County Sheriff's Office chose to stop him. In January 2017, Deputy Bolt received a report that an armed robbery had occurred. That armed robbery was for a purse snatching, from which the suspect had fled on foot, and contained a description of a black man, 5'6'' tall, with a medium build, wearing blue jeans and a black t-shirt. About half an hour after that report, Deputy Bolt saw Marcus and called out to him from her squad car and asked him to stop. She then got out of her squad car. At that same time, her colleague, Deputy Robert Hubbard, got out of his own squad car nearby, and the two officers approached Marcus. Deputy Bolt told Marcus then who she was, who she worked for, and that Marcus looked like he matched the description of an armed robbery suspect. Only then did she ask him any questions. Now, there are two disputed contentions in this case. First, that Deputy Bolt seized Marcus before she asked him any questions. And second, that Deputy Bolt had no reasonable suspicion sufficient to justify that stop. We'll go to the second first. Why, for purposes of a terrorist stop, given the description that she had received of a person committing an armed robbery, why was it unreasonable for Deputy Bolt to think this guy might be the guy and to stop him? And then to conduct a show-off, which is what she did. Your Honor, there are several reasons that the stop was unreasonable. Starting, first of all, with the vagueness of the description on which Deputy Bolt arrived. Now, the description that she received in this case was the only reason that she justified for her stop with Marcus. And that description was for a black male, 5'6", medium build, wearing blue jeans and a black fitted sweatshirt. Why is that insufficient for a police officer, if you see someone matching that description, to stop them? Because, Your Honor, a terrorist stop has to be based on a reasonable suspicion drawn from specific and articulable facts that link the person's stop to some kind of criminal activity. Well, didn't you say that the defendant matched the descriptions you heard of the suspect's gender, race, sex, and height, and approximate build, and also was wearing blue jeans and a black fitted sweatshirt? Your Honor, yes. She testified that she stopped him because she saw that he was wearing a blue jeans and a black fitted sweatshirt. Why is that so? Because that description in and of itself would fit a myriad of individuals. It doesn't have anything... But it wouldn't fit a myriad of individuals that were near the vicinity of where the armed robbery occurred. Or would it? Unfortunately, Your Honor, there's no evidence in the record regarding the makeup of the neighborhood, necessarily. Well, for purposes of a reasonable police officer, that's the standard, isn't it? You threw her eyes? Yes, Your Honor. It's an objective test. Based on the information known at the time, given that Terry stopped for purposes of conducting a show-off, why is this unreasonable? I still don't understand why this isn't a close enough identification. Because in addition to the fact that the description was vague and could have fit a large number of individuals, it didn't have a large number of characteristics that might have been more specific. It didn't have anything about complexion. It didn't have anything about hairstyle. It didn't have any identifying marks such as tattoos or birthmarks or something along those lines. It didn't have a number of things that might have been more specific to link the description to a particular individual. But in addition to the vagueness of that description, the surrounding circumstances didn't support a stop in that instance. What do you mean? If we agree, if we were to agree that it was enough to justify Terry's stop based upon the identification, is that the end of this case? I'm not sure. Are you talking about the manner of the stop, or what else is there to talk about? I'm talking about, Your Honor, specifically the other discernibly different items of clothing that Mr. Turner was wearing at the time that he was stopped. In specific, a blue baseball cap and a black jacket were not part of the description. His discernibly different mode of transportation in that the suspect in the armed robbery was reported to have fled on foot, and Marcus was recognized, was stopped while he was riding his bicycle. And in particular, the gap of time coupled with the close proximity to the crime scene makes it unreasonable to incur that Marcus was at that time fleeing from the scene of an armed robbery. The standard for the reasonableness of that stop is that under the totality of the circumstances, in addition to reasonable inference, it was drawn from those circumstances. It was not a reasonable inference. A half an hour after the reported robbery, while Marcus was riding a bicycle, which could have cleared the area a block and a half much faster than in a half an hour, to infer that Marcus was at that time fleeing from a scene a block and a half away. In addition to this, you know, there's no evidence or no suggestion that Marcus was fleeing, that he looked like he was going in a direction that was moving away from the scene of the crime, or that he was even a slightly short threat at the time that she stopped him. Well, if it's in the first half hour, those wouldn't be evident no matter what. I mean, you're talking about fleeing. I assume it's acknowledged that he must have decided, I mean, it's acknowledged that he wasn't fleeing at the time she saw him. Yes, yes, or I don't know that there's any specific testimony on that, but it seems very clear in the evidence that he wasn't fleeing at the time. And what I'm saying is that the description was so vague that by itself it couldn't support a stop. And it could only have supported a stop if there were other circumstances that suggested that a stop would be reasonable at that point in time. And what I'm saying is circumstances such as fleeing or such as, you know, if the stop had been within a minute or two after the report had, you know, occurred, obviously those kinds of circumstances would have supported an inference that maybe this rough match to this rough description in addition to the fact that it was, you know, close in time, that he was fleeing or out of breath or something along those lines, those may have been, you know, able to support a reasonable inference that this person was fleeing the scene of the crime. There's no such circumstances in this case. Deputy Bolt testified, right, at the motion hearing? Deputy Bolt? Yes. So going back to your bicycle element here, was there any testimony by Deputy Bolt that would give us some insight as to her thinking why she stopped this individual who was on a bicycle when the description was an individual on foot had committed the crime? Or was there no testimony giving us some insight into her thinking? I don't believe, Your Honor, that there was testimony giving insight as to the bicycle in particular. Again, Deputy Bolt's testimony when asked why she chose to stop Marcus was that she simply thought he was wearing blue jeans and a black hooded sweatshirt and his size was roughly, you know, within the parameters of the description that she had. Was there evidence that this was a residential area? Unfortunately, Your Honor, there wasn't any testimony really regarding well, there may have been testimony that there were homes in the area, but there was no significant discussion of the type of area, the makeup of the neighborhood, or anything along those lines. It's certainly possible that the defendant was it couldn't be excluded from Deputy Bolt's mind if it was a residential area that he potentially lived in the area. It wouldn't have been, then, out of the ordinary or incompatible with him riding a bicycle in that area a half hour later, still addressed in the manner in which the victim described. I'm sorry, Your Honor, I Can you Sure, yeah. We just don't know, Bolt's thinking, why she thought that this fellow on a bicycle could be the suspect, even though the victim reported the individual fled on foot. Could have put two and two together and thought maybe this was his neighborhood, this is where he lived. She could have been thinking that he had stashed a bike in a bush and jumped on it, any number of things, but we just don't know. There's a vacuum in regards to her thinking at that point, right? Yes, Your Honor, I believe that there's no testimony on it. The only testimony that she did give, the only information that we can work off of, is that response that she gave, that she stopped him because he had blue jeans and a black knitted sweatshirt and that she thought he roughly matched the satisfaction. Those are the only facts that she gave in regards to her reasons for stopping him. The black jacket was worn over the black hooded sweatshirt. I believe so, yes, Your Honor. And Deputy Bolt noticed that he was wearing that jacket and that he was wearing the blue baseball cap, she noted them in her report that she testified to. And she was aware that he was wearing those discernibly different items of clothing, things that were not in the description. She was aware that he was on his bicycle, obviously, because she saw him when he was riding his bicycle and asked him to stop. She was aware of these discernible differences and yet chose to stop him anyway, which is part of what led into this being an unreasonable stop. So no reasonable police officer in her position would have thought this would be appropriate to stop this guy and take him for a show? No, Your Honor. Well, again, without sufficient supporting facts, it's unreasonable to make the inferences that would have had to be made in order for Deputy Bolt to decide that Marcus was or had recently been engaged in criminal activity. At that point, there was no indication, again, that he was fleeing or doing anything else suspect. Her only reasons, again, go back to that very vague description, a description which, if by itself, would have been sufficient to support this stop, would have almost allowed her to stop any black man walking by at that point in time. Would it have to be about 5'6", in a medium build, wearing a hoodie and jeans? I'm sorry, Your Honor? Wearing a hoodie and jeans? Yeah. Again, blue jeans and a hooded sweatshirt. This was in the month of January. It was not an uncommon set of clothing that could have been walking by at that period of time, or at least, yes, any black man who was wearing blue jeans and a black hooded sweatshirt. This exceedingly general description with exceedingly common clothing, again, by itself can't support a reasonable suspicion to engage in assault. Now, as to the seizure, the trial court found that Marcus was seized by the two deputies, and the parties actually stipulated in their stipulation of the stipulated bench trial that Marcus was seized by Deputies Bolt and Hubbard before they arrested him. And in regards to the seizure, the trial court found these facts, that Deputy Bolt asked Marcus to stop, that Marcus stopped, that Deputy Bolt was joined by Deputy Hubbard, that both officers were in squad cars, that it was reasonable to infer that they were in uniform, and that they clearly had some authoritative presence when they approached Marcus. Deputy Bolt further testified that both officers approached Marcus to probably within arm's length, and that she told him, before asking him questions, who she was, who she worked for, and that he matched the description of an armed robbery suspect. Now, Marcus, now, first of all, her request that he stop. She called out to him and asked him to stop, and he clearly felt compelled to do so because he did. So, Marcus was likely seized as of the moment that Deputy Bolt asked him to stop, and he complied with that request. If we think the identification was sufficient to justify the stop, does any of this matter? I'm sorry, Your Honor, can you say that again? If we think the deputy had sufficient information to justify the stop, does anything that you're now talking about matter? What do you mean? I'm sorry, if she had a reasonable suspicion to make this up? It depends on at what stage, I suppose, she made the stop, but... Or she sees him, matches the description, and she stops him. Then the seizure itself, again, depending on when it occurs. If she had a reasonable suspicion... My question is, does that matter? Then if she had a reasonable suspicion, then no. The timing of the seizure or the existence of the seizure. Whether she talks to him first or doesn't talk to him first, none of that would matter, would it? I suppose not, Your Honor, if she did have a reasonable suspicion. However, again, however, the first inquiry in determining whether Terry's stop is valid is whether or not the seizure took place. Again, the trial court found that a seizure did take place in this case. The only question, really, is when the seizure took place. Our contention is that that seizure took place before she asked him any questions. Now, again, Marcus was asked to stop, and he then did stop. Even if at that moment he wasn't seized, he was then approached by two law enforcement officers, whom the trial court thought was reasonable to infer were in uniform, and who clearly had an authoritative presence in the approach. At that point, Marcus was, again, would have been seized. Even if not seized at the time, he was asked to stop and then stopped. He was seized at that point. Then, once the two deputies had approached him, Deputy Bolt prefaced anything else that she said by telling him who she was and who she worked for, in case the fact that they were law enforcement officers was not clear at that point. It certainly was by then. And then she told him that he matched the description of an armed robbery suspect. No reasonable person would have felt free to leave at that point. So, at the very, very least, by the time she told him that he looked like he was an armed robbery suspect, no reasonable person would have felt free to leave or refused to answer the officer's questions in that instance, without first allaying their concerns regarding whether or not the person stopped had, in fact, been involved in an armed robbery. So, because Deputy Bolt's seizure took place before she asked any questions, and because that seizure was unreasonable, and she did not have a reasonable suspicion to support it, the evidence in this case that she gleaned should have been suppressed when Marcus went for his suppression. Now, in Griffith's case at trial, the state was required to prove that Marcus was required to register with law enforcement, that he did not register with law enforcement in the location where he was living, and that he had not done so within the timeframe required by statute. The only evidence that the state had of where Marcus was living and how long he had lived there came from questions that Deputy Bolt asked after she stopped him. Because Marcus was seized before Deputy Bolt ever asked those questions, and because the seizure was unreasonable under the totality of the circumstances available to the officer at the time, the evidence that she obtained during her questioning should have been suppressed. Because the state cannot fulfill its burden of proof without that evidence, Marcus requests that this court reverse his conviction power. Thank you. Okay. Thank you, counsel. Mr. Bagers? May it please the court, counsel, I was so pleased to hear counsel talk about the totality of the circumstances being a factor in evaluating the officer's actions. Some of the cases, I learned to equate that phrase with the whole picture, consider the whole picture. What we have here was the purse snatching in daylight, which would indicate it's a primal opportunity with little or no planning, excuse me, no escape planning. The purse snatcher was on foot. And Bolt testified she was not the first of several law enforcement persons to arrive. And she testified that they had a canine tracking unit and several other people in the area, going through yards, going over fences. So it's reasonable to believe that this manhunt by these officers, it's reasonable that they believe, and Bolt believed, that the purse snatcher was hiding in that area. Now, I can't tell you exactly how big it is. There was a map introduced that looks to me like maybe a mile by a mile or a mile by a half mile. So they're having a manhunt. Over the radio comes a description. And she gets there and, bang, she sees a defendant. He's wearing a black hooded sweatshirt. He's the same race. He's the same gender. He's parking at the same height, same build. So she stops. And the trial judge at the original motion to suppress found that this was a consensual encounter at first. And you can see several times in the record. And Bolt hardly agrees that she asked him if he would stop. And then that evolved into the Terry stop, and that evolved into probable cause. So when you consider the whole picture, the totality of the circumstances, along with the description of the purse snatcher, the idea that there's a manhunt going on that may have flushed out the purse snatcher, and the closeness to the crime in distance and time, the deputy had a reasonable suspicion based upon solid facts. Also, this encounter was very brief. As I said, the trial judge at one point found that it was a consensual encounter. And she said that she ran him through a medcat. Other times she said she ran him through leads. I think they're basically the same thing. And it came back almost right away, or right away, I think the judge said, quote, almost immediately, that he had violated the Sex Offenders Registration Act, which I'll call SORA, unless somebody wants to correct me. And I thought, that's public information. I mean, I admit to being the least knowledgeable person in the room about the Internet, but I think the sex offenders, their convictions, and their violations are on a national website, an Illinois Department of Corrections website, a state police website. So some of these cases say, well, the officer can run a check for a warrant because it's public information. Well, this is public information. So what she really got from this defendant was his name and public information. So I don't see how, if you construe it as a terrorist act, how she's doing anything wrong. Questions? Okay, thank you, counsel. Mr. Scanlon? In the love of your honor, and please support, I only have a couple quick points in response. Counsel, the state talked about the totality of the circumstances in the whole picture and about the possibility that officers who were searching the area or who were in the area might believe that the robbery suspect was hiding in the area. Unfortunately, counsel, this is essentially no testimony that's in the record. Nobody ever testified regarding any overarching belief regarding what the robbery suspect had done once they fled the robbery suspect might have been hiding in the area. That's simply not a piece of information that's in the record. The defendant's burden on a motion to suppress the show of police conduct was unreasonable, is it not? Yes, your honor. And did any of this get pursued as to what you thought, Deputy Boat, and the nature of this offense and what it might have meant? Sorry, your honor, I'm not sure I follow your question. Well, Mr. Major's inferences from the evidence in this case that this is a crime that didn't require, it doesn't, of course, it actually doesn't require typical careful planning. It's a crime about paternity and maybe the guy's hiding in the neighborhood. Again, your honor, the only answer to that is that there's no testimony about that in the record or that that supported her reasons for stopping Marcus to begin with. The question is faced with, you know, the information that she had available to her and the information that she had available to her at that time was her belief that Marcus roughly matched this description and her knowledge that he was on a bike, that this was a half an hour after the report had been made, that he was only a clock and a half from the scene of the robbery at the time. Those don't support an inference that Marcus was fleeing or involved in any way in the crime. There's no evidence that he was carrying a purse or any other bag or implement that might suggest the proceeds of the robbery. There is, again, no evidence that he was fleeing or even short of breath at the time. She stopped him. Nothing in the way of surrounding circumstances that might support her reliance on the description alone as her reason for stopping Marcus in that instance. In his brief, the state also relies heavily on Marcus's decision not to testify regarding his subjective belief about whether or not he was free to leave. This is, again, in regards to the seizure. That is an objective test regarding whether or not a reasonable person in Marcus's place would have felt free to leave. And we argue that at the very least, as soon as that people told him he looked like a robbery suspect, no reasonable person in that situation would have felt free to leave. So all of the questions she asked and all of the information that the state refers to in regards to his name, the lead search, and everything else came after he was seized. And if her stop was unreasonable, as we contend that it is, then none of that information should have been allowed in any of the principles. For that reason, Marcus requested the support of the state. Thank you, counsel. The court will take this matter under advisory and recess.